# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ANDREW ROBINSON,

     Plaintiff,

v.                                         No. 1:22-cv-00748-DHU-SCY

CENTURION CORRECTIONAL
HEALTHCARE OF NEW MEXICO, LLC,
MHM HEALTH PROFESSIONALS, INC.,
DAVID JABLONSKI, SECRETARY OF CORRECTIONS,
in his individual capacity, ORION STRADFORD,
BUREAU CHIEF, in his individual capacity, STEVE MADRID,
GRIEVANCE OFFICER, in his individual capacity, DAVID
SELVAGE, HEALTH SERVICES ADMINISTRATOR, in his
individual capacity, MURRAY YOUNG, CENTURION
REGIONAL MEDICAL DIRECTOR, in his individual capacity,
JEFF KELLER, CENTURION REGIONAL MEDICAL DIRECTOR,
in his individual capacity, JEANNIE SHACKLETON,
UTILIZATION MANAGER, in her individual capacity,
LLCF DIRECTOR OF NURSING, in their individual capacity,
LLCF SITE MEDICAL DIRECTOR, in her individual capacity,
JOHN DOE MEDICAL PROVIDERS 1-5, in their individual
capacities,

     Defendants.

## MEMORANDUM OPINION AND ORDER

Plaintiff, a former inmate, brings this action under 42 U.S.C. § 1983, claiming the defendant prison officials violated his Eighth and Fourteenth Amendment rights by providing him inadequate medical care. The New Mexico Corrections Department Defendants ("NMCD Defendants")[1] moved for judgment on the pleadings under Fed. R. Civ. P. 12(c), asserting they are entitled to qualified immunity because Plaintiff failed to allege a violation of a clearly

---

[1] The four NMCD Defendants are: Secretary of Corrections David Jablonski, Bureau Chief Orion Stradford, Grievance Officer Steve Madrid, and Health Services Administrator David Selvage.

established right. *See* Mot., Doc. 25. The Court, having considered the motion, briefs, arguments and being fully advised of the premises, concludes that the motion will be DENIED.

## A.
## BACKGROUND

Because this a motion to dismiss, the Court presents the facts as pled in the First Amended Complaint ("FAC"). *See Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013).

At the time of the events in question, Plaintiff was a twenty-five-year-old inmate at the Lea County Correctional Facility ("LCCF"), which is owned and operated by NMCD. *See* FAC ¶¶ 1, 17, 40, Doc. 20. Centurion Correctional Healthcare of New Mexico, LLC ("Centurion") had a General Services Contract ("GSC") with the Department of Corrections to provide prison medical care. *Id.* at ¶ 12. Under the GSC, Centurion adopted NMCD's policies and customs as its own, and NMCD likewise adopted Centurion's policies and customs as its own. *Id.* at ¶ 13. Defendant MHM Health Professionals, Inc. ("MHM") subcontracted to supply medical personnel to NMCD prisoners. *Id.* at ¶¶ 14, 15. NMCD governs and operates LCCF while independent contractors carry out discrete duties at NMCD's discretion. *Id.* at ¶ 24. NMCD retains ultimate authority over LCCF. *Id.* at ¶ 18.

Secretary of Corrections David Jablonski "oversaw prison operations" and was charged with ensuring that inmates had access to adequate health care. *Id.* at ¶ 20. Health Services Administrator ("HSA") David Selvage maintained "direct clinic oversight over independent medical contractors, ensuring that NMCD contractors provided adequate care" to inmates. *Id.* at ¶ 21. Bureau Chief Orion Stradford was responsible for monitoring the work of independent contractors, including Centurion and MHF, and acted as NMCD's supervisor over its independent contractors." *Id.* at ¶ 22. And, finally, Steve Madrid was in charge of NMCD's

grievance process and acted as the "gatekeeper" between inmates and their access to adequate healthcare. *Id*. at ¶ 23.

While incarcerated at LCCF, had a history of intravenous drug abuse that made him susceptible to infections, including osteomyelitis.[2] *Id*. On August 7, 2019, Plaintiff started complaining of lower back pain, which he described as a "10/10" level of pain. *Id*. at ¶ 41. Over the next two months, from August to October 2019, Plaintiff requested medical attention for his back pain at least nine times. *Id*. at ¶¶ 42, 43.

For example, on August 15 2019, Plaintiff reported that his pain was "10/10" and, a few days later, complained that the pain medications were not helping. *Id*. at ¶¶ 43(a), (b). Not long after, on August 31, 2019, Plaintiff reported difficulty walking, moving, and sleeping. *Id*. at ¶ 43(d). He was eventually transported using a wheelchair to the prison's medical center after reporting that he had difficulty breathing and that he turned blue. *Id*. In September 2019, he continued to report sharp and constant back pain that radiated down his hips and, on September 25, 2019, Plaintiff was unable to walk straight and had to rely on a cane. *Id*. at ¶¶ 43(e), (f), (g).

An October 7, 2019 MRI of his lumbar spine revealed osteomyelitis. *Id*. at ¶ 43(h). The next day, on October 8, 2019, a PICC line was established for antibiotics treatment of osteomyelitis and Plaintiff was transferred to the University of New Mexico Hospital, ("UNMH"). *Id*. at ¶¶ 43(i), (j). Plaintiff remained hospitalized at UNMH until October 19, 2019. *Id*. at ¶ 43(j). Plaintiff briefly returned to the prison hospital but was once again hospitalized at UNMH on November 10, 2019 after he reported a 102-degree fever. *Id*. at ¶¶ 43(j), (k). Plaintiff was treated for sepsis and discharged from the hospital on November 15, 2019. *Id*. at ¶ 43(k).

---

[2] "Osteomyelitis is an [i]nflamation of the marrow and hard bone tissue of bone, usually caused by a bacterial infection." *Gobert v. Caldwell*, 463 F.3d 339, 344 (5th Cir. 2006).

Plaintiff now suffers from "permanent spinal damage, and consequent disabilities." *Id.* at ¶ 2. During the two months that he complained to prison officials of pain, he never received any pain medication other than ibuprofen. *Id.* at ¶ 46. In addition, Plaintiff never saw a medical doctor during those two months. *Id.* at ¶ 47. He was instead seen by nurses who acted like he was feigning his pain when in fact he had a dangerous, life-threating infection. *Id.* at ¶ 48.

The thrust of Plaintiff's First Amended Complaint is that his injuries resulted from systemic deficiencies in staffing, training, and procedures. For example, under prison policy, an inmate wanting medical attention must complete a Health Services Request that is sent to the duty nurse. *Id.* at ¶ 95. To trigger "provider review" there must be three "of the same complaints" on a Health Services Request. *Id.* at ¶ 96. However, nurses lacked the training to identify osteomyelitis, meaning they did not have the ability to properly identify something like osteomyelitis. *Id.* at ¶¶ 97, 102. The result was that nurses were making de facto diagnoses and review by a physician was not triggered. *Id.* at ¶¶ 97, 99.[3] Plaintiff's nurse simply took his vitals, "declare[d] [him] healthy, state[d] that nothing c[ould] be done, and sen[t]" Plaintiff back to his cell or pod. *Id.* NMCD Health Services Administrator David Selvage—whose job it was to oversee independent contractors to ensure that the contractors were providing adequate prison care—provided no training to correctional staff on the symptoms of osteomyelitis or sepsis. *Id.* at ¶¶ 21, 63. Neither did Selvage establish reporting requirements for staff when deadly infections such as osteomyelitis and sepsis are apparent. *Id.* at ¶ 62.

In addition to deficient procedures concerning diagnoses, Plaintiff alleges that prison procedures for making referrals to outside providers are problematic. Because prison hospitals

---

[3] Plaintiff alleges that nurses are prohibited from making medical diagnoses, but he does not identify the statutes or regulations that restrict nurses' authority. Nevertheless, because this is a motion for judgment on the pleadings, the Court will assume that nurses lack authority to diagnose conditions.

often lack the ability to perform things like blood cultures, CT scans, or MRIs, which are needed to diagnose and treat infections such as osteomyelitis and sepsis, outside medical referrals are necessary. *Id*. at ¶ 55. However, because of inadequate procedures, on-site medical personnel cannot make a referral to an outside provider without prior corporate approval through the Utilization Management/Review process, which is software modeled on insurance referral standards. *Id*. at ¶¶ 52, 54. The software will sometimes automatically deny a referral, and prison medical staff cannot make outside referrals without going through the Utilization Management process. *Id*. at ¶¶ 54, 56.

Plaintiff further alleges that his referral to the emergency room "was not made until it was too late to avoid severe and permanent harm in order to avoid the cost of a referral." *Id*. at ¶ 52. Centurion was not responsible for paying an inmate's medical bills if his offsite stay lasted more than 24 hours. *Id*. at ¶ 107. Centurion therefore delayed referring inmates for offsite treatment until it seemed certain that the inmate's hospital stay would last more than 24 hours. *Id*. at ¶ 108.

There are also inadequate procedures concerning medical recordkeeping, according to Plaintiff. The prison lacks an electronic health record ("EHR"), even though the GSC between NMCD and Centurion mandated the use of an EHR for constitutionally adequate medical care. *Id*. at ¶ 57. NMCD also recognized, in 2010, the necessity of an EHR. *Id*. at ¶ 58. To date, no EHR has been purchased on implemented, even though an EHR would protect against the loss and destruction of medical records. *Id*. Consequently, medical files are missing, notes are not placed in charts, and notes and staff signatures are illegible. *Id*. at ¶¶ 57, 58. Even Centurion managers cannot read notes and signatures placed in inmate files. *Id*. at ¶ 57. Jail officials also failed to maintain a record—in the form of sign-in sheets, attendance rolls, or minutes—of

weekly calls where personnel discussed notable medical cases. *Id.* at ¶¶ 60, 61. In 2019, despite a high number of cases of osteomyelitis and heart infection cases, only one osteomyelitis case was addressed during the weekly calls. *Id.* at ¶ 60. Centurion's poor recordkeeping also extended to "misplacing or otherwise failing to provide medical record for critical time periods leading up to the hospitalization of patients." *Id.* at ¶ 76.

Plaintiff also alleges inadequacies in the medical grievance process. NMCD Defendant Steven Madrid is responsible for the medical grievance system. *Id.* at ¶ 118. According to Plaintiff, "[t]here is a long-standing pattern of ignoring medical grievances on the part of NMCD and its contractors." *Id.* at ¶ 120. NMCD does not track the number of medical grievances filed against individual personnel. *Id.* Nor does it track medical grievances filed for specific issues such as osteomyelitis and sepsis. *Id.* In addition, NMCD's current Health Services Administrator, Wence Asonganyi, testified that the HSA is not involved in the medical grievance process, meaning that the individuals supervising grievances are correctional personnel and administrators with no medical licensing. *Id.* at ¶¶ 120, 121.

According to Plaintiff, Defendants were on notice of certain systemic deficiencies. In 2018, the New Mexico Legislative Finance Committee issued a Committee Report which found that both state and contractor medical positions had a 25% vacancy rate, which "threatened the quality of care provided." *Id.* at ¶ 71. The Committee Report also referenced an audit of Centurion which found that Centurion's charts fell short of industry best practices. *Id.* at ¶ 77. The audit noted that some patient charts were "illegible or inaccurate, not filled out and submitted timely, and not used consistently." *Id.* The audit recommended that prison staff be better education by both Centurion and NMCD on chart documentation and consistency and in correctly completing prisoner intake forms. *Id.* at ¶ 89. Plaintiff alleges that the severe

6

understaffing and medical document issues were unconstitutional patterns and practices of which Centurion had notice through the Committee Report. *Id*. at ¶¶ 71-73, 75-85.

In addition to the Committee Report, the First Amended Complaint references seventeen lawsuits against Centurion or its corporate predecessor, Wexford Health Services, Inc. *Id*. at ¶¶ 103, 106. The cases show that Centurion "persistent[ly] refus[ed] to refer inmate patients out to third-party medical providers for the provision of care unavailable through Centurion within NMCD's facilities," *id*. at ¶ 105, and "establish that both NMCD and Centurion were on notice of … widespread unconstitutional practices prior to [Plaintiff's] injuries and thereby knew that additional safeguards should have been in place to address patients' signs of serious medical needs …." *Id*. at ¶ 109.

**B.**
**PROCEDURAL BACKGROUND**

On October 7, 2022, Plaintiff filed his first Complaint. [4] The NMCD Defendants moved to dismiss the Complaint under Fed. R. Civ. P. 12(b)(6) based on qualified immunity. About two weeks later (and in lieu of responding to the motion to dismiss), Plaintiff filed his operative First Amended Complaint under 42 U.S.C. § 1983 against the NMCD Defendants in their individual capacities. Plaintiff also asserted claims against Centurion, MHM, and at least eight identified and unidentified medical providers employed by either Centurion or MHM.[5]

---

[4] Plaintiff's First Amended Complaint supersedes his original Complaint. *See Mink v. Suthers*, 482 F.3d 1244, 1254 (10th Cir. 2007) ("an amended complaint supercedes an original complaint and renders the original complaint without legal effect."). As such, the Court denies as moot the NMCD Defendant's original Motion to Dismiss Plaintiff's now-superseded first Complaint. *See Sentry Ins. a Mut. Co. v. Pichardo*, No. 1:20-CV-00497-JCH-CG, 2021 WL 4034092, at *5 (D.N.M. Sept. 3, 2021) ("It is well settled that a timely-filed amended pleading supersedes the original pleading, and that motions directed at superseded pleadings may be denied as moot.").

[5] The caption of the First Amended Complaint also lists as defendants five unidentified "John Doe Medical Providers." FAC at 1. But the Court notes that Plaintiff did not list these individuals as parties in the FAC itself, nor have they entered appearances.

Plaintiff's FAC asserts two counts. First, in Count I, Plaintiff alleges the NMCD Defendants violated Plaintiff's Eighth and Fourteenth Amendment right by acting with deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment under 42 U.S.C. § 1983. According to Plaintiff, the NMCD Defendants ignored obvious signs of potential harm, such as Plaintiff's "persistent expressions of intolerable and worsening pain, including debilitating back pain, his frail physical appearance, and his inability to walk, sleep, and dress without assistance." FAC at ¶ 129. Plaintiff alleges that their deliberate indifference to his serious medical needs "caus[ed] extensive hospitalizations, sever injuries, and permanent disability." *Id*.

In Count II, Plaintiff alleges that the NMCD Defendants and Centurion violated Plaintiff's Eighth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983 by maintaining a policy a practice of denying medical care. Plaintiff alleges that the NMCD Defendants are liable for maintaining a policy, practice or custom of "persistently refus[ing] to refer patients to third-party medical providers, fail[ing] to oversee and ensure inmates received access to adequate medical care, [and] faili[ing] in the oversight of independent medical providers," all of "which resulted in the failure to properly train, recognize, and treat emergent infections, including osteomyelitis." *Id*. at ¶ 143. Plaintiff further alleges in Count II that the NMCD Defendants "had oversight authority, but failed to perform any oversight, allowing these patterns and practices to occur." *Id*. at ¶ 144.

The NMCD Defendants moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), once again asserting the defense of qualified immunity. As to Count I, Plaintiff's deliberate indifference claim, the NMCD Defendants' central argument is that they cannot be held liable for other prison officials' alleged misconduct because the "NMCD Defendants were

not medical providers, were not personally involved in Plaintiff's medical care, and, in fact were not even aware of Plaintiff's need for medical care." Defs.' Reply at 1. Second, they argue that assuming, *arguendo*, they were aware of an unconstitutional policy, that "does not equate to a claim that [the] NMCD Defendants themselves intentionally denied or delayed access to medical care for Plaintiff or that they interfered with his treatment," which they claim is necessary to support a deliberate indifference claim. Defs.' Mot. at 7. And, they argue that Plaintiff may not plead against a group of defendants, as a collective and undifferentiated whole.

As for Count II, Plaintiff's policy-and-practice claim, the NMCD Defendants recognize that supervisory liability may attach based on a supervisor's maintenance of a policy or custom that results in an injury. However, they argue that Plaintiff's allegations fail because Plaintiff has not pointed to a facially unconstitutional policy. They also argue Plaintiff does not plausibly allege each NMCD Defendant personally implemented, utilized, or promulgated an illegal practice or policy. They argue that a mere "connection with an unconstitutional practice" is insufficient to impose supervisory liability. Defs.' Mot. at 11. The Court will present additional facts and argument as needed in the sections that follow.

## C.
## LEGAL STANDARD

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When a § 1983 defendant raises qualified immunity, as the [defendants] did in their motion for judgment on the pleadings, the burden shifts to the plaintiff to establish both prongs of the defense." *Hunt v. Montano*, 39 F.4th 1270, 1284 (10th Cir. 2022) (citation omitted). "To overcome this presumption, the

9

plaintiff must show (1) the defendant's actions violated a constitutional or statutory right, and (2) that right was clearly established at the time of the defendant's complained-of conduct." *Bledsoe v. Carreno*, 53 F.4th 589, 606 (10th Cir. 2022) (citation omitted). "Under this two-part test, 'immunity protects all but the plainly incompetent or those who knowingly violate the law.'" *Ullery v. Bradley*, 949 F.3d 1282, 1289 (10th Cir. 2020) (quoting *Kisela v. Hughes*, ——U.S.— —, 138 S. Ct. 1148, 1152, 200 L.Ed.2d 449 (2018)). "If the plaintiff fails to satisfy either prong of qualified immunity, his suit fails." *Hemry v. Ross*, 62 F.4th 1248, 1253 (10th Cir. 2023). "Courts have discretion to decide the order in which they address these two prongs." *Roberts v. Winder*, 16 F.4th 1367, 1374 (10th Cir. 2021).

"The procedural posture of the qualified-immunity inquiry may be critical." *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022). Because it is "a fact-bound inquiry, qualified immunity defenses are typically resolved at the summary judgment stage rather than on a motion to dismiss." *Roberts*, 23 F.4th at 1256. Asserting a qualified immunity defense via a motion for judgment on the pleadings therefore "subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). "This is because at [the motion for judgment on the pleadings] stage, it is the defendant's conduct *as alleged in the complaint* that is scrutinized for objective legal reasonableness." *Hemry*, 62 F.4th at 1253 (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)).

Therefore, "[t]o survive a motion for judgment on the pleadings based on qualified immunity, plaintiffs 'must allege sufficient facts that show—when taken as true—the defendant plausibly violated [the plaintiff's] constitutional rights, which were clearly established at the time of violation." *Hunt*, 39 F.4th at 1278 (quoting *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir.

2012)). Finally, the reviewing court views all well-pleaded allegations in the complaint "in the light most favorable to the plaintiff." *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021).

**D.**
**DISCUSSION**

Because the facts, legal theories, and arguments supporting both of Plaintiff's Counts highly overlap, the Court will analyze Plaintiff's claims together rather than separately.

**1. Plaintiff Has Plausibly Alleged Constitutional Violations**

The constitutional right at issue in both Counts is Plaintiff's right to be free from "cruel and unusual punishment" under the Eighth Amendment.[6] U.S. Const. amend. VIII. "It is well established that prison officials violate the Eighth Amendment if their 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain.'" *Kikumura v. Osagie*, 461 F.3d 1269, 1291 (10th Cir. 2006) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." *Id.* (quoting *Estelle,* 429 U.S. at 104-05). The Eighth Amendment therefore establishes a "minimum standard of medical care while incarcerated." *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018) (citing *Estelle*, 429 U.S. at 101–05 & n.6). And "a prison official's deliberate indifference to a convicted prisoner's serious medical needs constitutes cruel and

---

[6] The NMCD Defendants argue that Plaintiff's Fourteenth Amendment claims should be dismissed because the Fourteenth Amendment only applies to pretrial detainees as opposed to prisoners. However, it does not appear that Plaintiff is asserting independent Fourteenth Amendment claims. Rather, Plaintiff asserts claims exclusively under the Eighth Amendment, as incorporated through the Due Process Clause of the Fourteenth Amendment. Plaintiff's FAC makes clear that the challenged conduct occurred while he was an inmate; there are no allegations that he suffered constitutional violations as a pretrial detainee. In any event, the standards for analyzing claims by pretrial detainees under the Fourteenth Amendment are identical to those under the Eighth Amendment. *See Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1262 (10th Cir. 2022).

unusual punishment in violation of the Eighth Amendment." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1043 (10th Cir. 2022). "The deliberate indifference standard lies somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Est. of Beauford*, 35 F.4th at 1262.

According to Plaintiff, his claims against the NMCD Defendants in their individual capacities amount to claim of direct supervisory liability. Supervisors are often a step removed from the actual conduct of their subordinates. *See Dodds v. Richardson*, 614 F.3d 1185, 1209 (10th Cir. 2010) (Tymkovich, J., concurring). So, to establish supervisory liability, Plaintiff must show each NMCD Defendant's "*direct personal responsibility*" for the claimed deprivation of Plaintiff's Eighth Amendment right. *Porro v. Barnes*, 624 F.3d 1322, 1327 (10th Cir. 2010) (emphases in original). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "Section 1983 does not authorize respondeat superior liability for a supervisor based solely on the actions of his subordinates." *Burke v. Regalado*, 935 F.3d 960, 997 (10th Cir. 2019). "[S]upervisory status alone is insufficient." *Peterson v. Creany*, 680 F. App'x 692, 696 (10th Cir. 2017) (unpublished).

"To impose § 1983 liability the plaintiff first ha[s] to establish the supervisor's subordinates violated the [C]onstitution." *Dodds*, 614 F.3d 1194-95. A "subordinate" includes private prison medical staff who "work[ ] with law enforcement" and therefore act "under color of state law for purposes of § 1983." *Burke*, 935 F.3d at 996 (quoting *West v. Atkins*, 487 U.S. 42, 56 (1988)). Thus, in *Burke* the Tenth Circuit held that two sheriffs' supervisory liability could be predicated on constitutional violations by private medical jail nurses who took no action

12

to address an inmate's broken neck. *See id*. at 994, 996-97. Here, it appears that the medical staff who treated Plaintiff were employees of Centurion and/or MHM. *See* FAC at ¶ 45. The NMCD Defendants' motion does not dispute that the private nurses were "subordinates" whose alleged constitutional violations could be the basis for supervisory liability. The Court therefore turns to the remaining elements needed to establish the NMCD Defendants' liability as supervisors.

Plaintiff must next establish "an 'affirmative link' between the supervisor and the violation, which includes showing (1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind." *Valdez v. Macdonald*, 66 F.4th 796, 834 (10th Cir. 2023); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). The Tenth Circuit has reiterated that "it is particularly important in a § 1983 case brought against a number of government actors sued in their individual capacity ... that the complaint make clear exactly who is alleged to have done what to whom ... as distinguished from collective allegations." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011). "Plaintiffs must do more than show that their rights were violated or that 'defendants,' as a collective and undifferentiated whole, were responsible for those violations." *Pahls v. Thomas*, 718 F.3d 1210, 1228 (10th Cir. 2013) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1194 (10th Cir. 2010)). Therefore, "the complaint must isolate the allegedly unconstitutional acts of each defendant; otherwise the complaint does not provide adequate notice as to the nature of the claims against each and fails for this reason." *Matthews v. Bergdorf*, 889 F.3d 1136, 1144 (10th Cir. 2018) (citation and internal quotation marks omitted).

Turning to the first prong to establish supervisory liability, personal involvement, a plaintiff can satisfy this element by showing "the [supervisor] promulgated, created, implemented[,] or possessed responsibility for the continued operation of a policy," or "the

establishment or utilization of an unconstitutional policy or custom." *Burke*, 935 F.3d at 997

(quoting *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011)).

Taking Plaintiff's allegations as true, as the Court must, *see Thomas*, 765 F.3d at 1194,

Plaintiff has plausibly alleged that Jablonski, Stradford and Selvage maintained a policy or

custom of deficient medical care at the prison. Plaintiff has plausibly alleged that staff were

inadequately trained. A supervising prison official may be liable on a failure to train theory,

"[w]here there is essentially a complete failure to train, or training that is so reckless or grossly

negligent that future misconduct is almost inevitable." *Keith v. Koerner*, 843 F.3d 833, 838 (10th

Cir. 2016) (quoting *Houston v. Reich*, 932 F.2d 883, 888 (10th Cir. 1991)). At the time of the

events in question, Plaintiff had a history of intravenous drug use that made him susceptible to

infections like osteomyelitis. Yet, because of prison policy, Plaintiff had to describe his medical

problems to nurses who were unqualified to diagnose osteomyelitis or identify that condition.

Testimony given in another case by Centurion's medical director, Dr. Murray Young, supports

Plaintiff's allegations. Dr. Young testified that "you can't possibly train a nurse to ferret out

osteomyelitis and endocarditis when a patient has those issues. It's just not gonna happen," even

though the allegations suggest that osteomyelitis was relatively common in the prison

population. FAC at ¶ 101; Pl.'s Ex. 1, 3.

Therefore, inmates under the NMCD Defendants' control were unable to make their

medical problems known to staff because the nurses were not competent to diagnose illnesses

and then refer patients for those conditions. Under such circumstances, courts have found

deliberate indifference when an inmate is essentially denied access to appropriately qualified

health care personnel. *See Hunt v. Uphoff*, 199 F.3d 1220, 1223 (10th Cir. 1999) (deliberate

indifference established where, among other things, the plaintiff alleged that he was "denied

proper diagnosis and treatment because of the lack of a primary-care physician" at the prison); *Toussaint v. McCarthy*, 801 F.2d 1080, 1111–12 (9th Cir. 1986) (remanding to determine whether jail officials "place[d] an unconstitutional degree of reliance on MTAs [medical technical assistants and] registered nurses (RNs)" because "[i]f plaintiffs correctly contend that unqualified personnel regularly engage in medical practice, precedent indicates that the prison health care delivery system may reflect deliberate indifference to plaintiffs' medical needs."); *Ramos v. Lamm*, 639 F.2d 559, 576-78 (10th Cir. 1980) (holding that inadequate on-site physician coverage and prison's use of medical personnel as "physician substitutes" who made decisions and performed services for which they were neither trained nor qualified constituted deliberate indifference).

Plaintiff's resulting injuries were then consistent with the alleged deficiencies in training. Plaintiff's first report of pain on August 15, 2019 was a pain level of "10/10." FAC at ¶ 43(a). About two weeks later, Plaintiff reported difficulty breathing, his skin turned blue, and he had to be transported in a wheelchair. Rather than investigate the apparent medical crisis that Plaintiff was experiencing or report his alarming condition to trained medical officials, staff instead treated Plaintiff as a malingerer. He continued to report back and leg pain and mobility problems through September 2019. Plaintiff, then twenty-five-years-old, was unable to walk straight, and had to rely on a cane, and required assistance dressing himself. It took nearly two months for Plaintiff to be seen by a physician and to be transferred to UNMH for treatment. The allegations reflect that during this period, "[Plaintiff] was never provided with pain management other than ibuprofen," that he "never saw a medical doctor," and that nurses untrained in identifying osteomyelitis were dismissive of his severe pain. FAC at ¶ 46. These allegations go beyond

complaints about "general deficiencies" of the prison's medical care training. *Keith*, 843 F.3d at 838.

In addition, Plaintiff's allegations plausibly show that there were problems with understaffing and recordkeeping. The 2018 Committee Report warned that the 25% staff vacancy rate could threaten the quality of care provided. Yet the prison "chose to disregard that risk and, for years, continued to display a pattern and practice of severe shortages in medical staff." FAC at ¶ 73. The Committee Report also highlighted problems with recordkeeping practices. The report "emphasized that documentation of certain test results was missing, and intake forms were not completed for all prisoners." *Id.* at ¶ 77. Moreover, NMCD has recognized since 2010 that an EHR is necessary—and the contract between NMCD and Centurion mandated the use of an EHR—but still jail officials have not done anything meaningful, like purchase or implement an EHR. The result has been missing medical files, unreadable notes and signatures, and incomplete recordkeeping. And, because prison personnel "did not adequately document or otherwise communicate Plaintiff's rapidly deteriorating medical condition … he was not provided with the medical treatment he clearly needed …." *Id.* at ¶ 84. *See Ramos*, 639 F.2d at 575–78 (staff shortages amount to deliberate indifference if "inmates are effectively denied access to diagnosis and treatment by qualified health care professionals.")

Plaintiff's allegations sufficiently establish the requisite affirmative link between these deficiencies in the prison medical care system to each NMCD Defendant. Starting with Secretary Joblinski, the State of New Mexico invests the Secretary with managing "all operations of the department and … administer[ing] and enforc[ing] the laws with which he or the department is charged." N.M. Stat. Ann. § 9-3-5(A). He also must exercise general supervisory power over all department employees and take administrative action by issuing orders to assure compliance

16

with the law. *See id.* §§ 9-3-5 (B)(1), (5); *see also Anchondo v. Corr. Dep't*, 100 N.M. 108, 109, 666 P.2d 1255, 1256 (N.M. 1983) (describing the statutory duties of the secretary of corrections). The Secretary also has specific responsibility to "provide courses of instruction and practical training for employees of the department …." N.M. Stat. Ann. § 9-3-5(B)(7).

Plaintiff's case against Secretary Joblinski focuses on his failure to exercise his powers to end inadequate training of identifying emergent infections. Importantly, because this is a motion for judgment on pleadings, the allegations show that Secretary Joblinski, like each NMCD Defendant, *knew* that there were a high number of osteomyelitis and endocarditis cases and did nothing to protect inmates. *See, e.g.,* FAC at ¶¶ 1, 19 (stating that NMCD, through its officers, "knew that [Plaintiff] was at a high risk of developing osteomyelitis.") And the Secretary was aware that Plaintiff's "persistent expressions of intolerable and worsening pain, including debilitating back pain, his frail physical appearance, and his inability to walk to walk, sleep, and dress without assistance" posed a "substantial risk of harm" to Plaintiff, which are sufficient allegations to survive a motion for judgment on the pleadings. FAC at ¶ 129. *See Savage v. Fallin*, 663 F. App'x 588, 594 (10th Cir. 2016) (reversing summary judgment for department of corrections director where the plaintiff's complaint alleged that director "personally" decided to make the decision that resulted in the plaintiff's harm). Therefore, Secretary Joblonski, the administrator with statutory authority to issue orders, assure legal compliance, and provide training, was aware of a high number of cases of certain emergent infections, yet still maintained a policy or custom of inadequate medical care by relying on untrained nurses. Again, because Plaintiff alleges that Secretary Joblonski was aware of these deficiencies, Plaintiff's allegations establish his personal involvement.

The Court concludes that the allegations against Health Services Administrator David Selvage are also sufficient to survive dismissal. In *Gordon v. Schilling*, 937 F.3d 348, 358-59 (4th Cir. 2019), the Fourth Circuit reversed summary judgment in favor of a Virginia Department of Corrections health services director, finding that genuine issues of material fact existed about the director's review and enforcement of a policy that prevented a Hepatitis-C virus ("HCV") positive inmate from seeking treatment. The court cited the fact that the director had actual awareness of the inmate's HCV and reasoned that a jury could find that the director "by the very nature of [his] position" personally participated in the constitutional violation by not revising the policy. *Id*.

Like the director in *Gordon*, Selvage was aware of the Plaintiff's condition and did nothing to remediate the situation. Selvage was aware of "the "substantial risk of harm" to Plaintiff "due to [Plaintiff's] persistent expressions of intolerable and worsening pain, including debilitating back pain, his frail physical appearance, and his inability to walk, sleep, and dress without assistance." FAC at ¶ 129. Selvage—whose job it was to ensure adequate inmate care—therefore was aware that provider review of untrained nurses' conclusions would not occur, yet he provided "*no* training to correctional staff on osteomyelitis or sepsis," nor did he establish reporting requirements to track deadly infections like osteomyelitis even though NMCD knew that a high number of cases of osteomyelitis and endocarditis were present. *Id*. at ¶ 62 (emphasis added). The Court concludes that Plaintiff's allegations are sufficient to show Selvage's personal involvement.

Similarly, Bureau Chief Orion Stradford was "responsible for monitoring the work of independent contractors, including Centurion and MHF, and acted as NMCD's supervisor over its independent contractors." *Id*. at ¶ 22. He, like the other NMCD Defendants, "had notice of a

widespread practice by [NMCD] employees and agents … under which prisoners with serious medical conditions … were routinely denied access to" adequate medical care. *Id*. at ¶ 137. Viewing the allegations in the light most favorable to the Plaintiff, Joblonski, Selvage and Stradford maintained policies or customs of inadequate care.

Turning to Defendant Steven Madrid, the allegations support claims against him for deficiencies in the medical grievance process. Plaintiff alleges that Madrid oversaw NMCD's grievance process, making him the "gatekeeper" between inmates and their access to adequate care. *Id*. at ¶ 23. That concept refers to deliberate indifference based on a prison official's preventing an inmate "from receiving treatment or deny[ing] him access to medical personnel capable of evaluating the need for treatment." *Burke*, 935 F.3d at 992–93 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000)). "[I]f the official knows his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, ... he also may be liable for deliberate indifference." *Id.* (quoting *Sealock*, 218 F.3d at 1211).

According to Plaintiff, "[t]here is a long-standing pattern of ignoring medical grievances on the part of NMCD and its contractors." FAC at ¶ 120. In addition, NMCD's current Health Services Administrator testified that the HSA is not involved in the medical grievance process, meaning that the individuals supervising grievances are correctional personnel and administrators with no medical licensing. Madrid ran the grievance during the events in question, including hearing appeals, which draws the inference that Madrid was aware of Plaintiff's condition. *See Gordon*, 937 F.3d at 357-58 (jail official's personal liability could be established by the official's review and denial of grievance appeals that the plaintiff submitted). Plaintiff

19

plausibly alleges that as the "gatekeeper" between inmate and their access to medical care, "if Mr. Madrid [did] not responsibly manage the grievance process, inmates ha[d] no way of accessing necessary, proper, and competent medical care." FAC at ¶ 23. In addition, Plaintiff plausibly alleges that Mr. Madrid was aware of other deficiencies such as not tracking grievances filed against individual personnel and grievances based on specific health issues like osteomyelitis. The Court concludes that Plaintiff's allegations are sufficient to show Mr. Madrid's personal involvement.

Finally, the Court concludes that the allegations against the NMCD Defendants are unlike the conclusory allegations in *Iqbal*. In *Iqbal*, the Supreme Court held that the plaintiff had not plausibly alleged supervisory liability against Attorney General John Ashcroft and FBI Director Robert Mueller. 556 U.S. at 666, 680-83. The Court rejected the plaintiff's "bare assertions"— that Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject" the plaintiff to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest"—as conclusory because they "amount[ed] to nothing more than 'a formulaic recitation of the elements' of a constitutional discrimination claim." *Id.* at 680, 681 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). As explained in detail above, unlike the conclusory allegations in *Iqbal,* the allegations in Plaintiff's FAC establish the affirmative link necessary to sufficiently support a supervisory liability claim. In summary, Plaintiff has established the first prong to establish supervisory liability, personal involvement.

The second prong requires Plaintiff to establish causation. "A plaintiff [must] establish the requisite causal connection by showing the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of

her constitutional rights." *Schneider*, 717 F.3d at 768 (citation and internal quotation marks omitted). Plaintiff has plausibly alleged that the deficiencies at issue resulted in his injury. From the beginning, he reported debilitating pain to jail staff, yet it took nearly two months for him to have an MRI which later revealed osteomyelitis. In late August 2019, he reported not being able to breathe and his skin turned blue, yet staff did not report these symptoms to someone with medical training to properly assess Plaintiff's condition. Plaintiff soon had to use a cane and eventually required emergency treatment, twice, and now suffers from permanent spinal damage and consequent disabilities.

As noted earlier, Plaintiff's allegations are consistent with the alleged medical deficiencies described above. The highlighted deficiencies, especially lack of training, explain why staff not trained in osteomyelitis failed to timely act on Plaintiff's complaints of serious pain, why nurses erroneously concluded that Plaintiff was malingering, and why Plaintiff was not seen by a medical doctor for nearly two months after his first report of serious pain. The Court therefore concludes that Plaintiff's allegations sufficiently establish that the NMCD Defendants caused Plaintiff's injuries such that Plaintiff has met the causation prong of a supervisory liability theory. *See Van Riper v. Wexford Health Sources, Inc.*, 67 F. App'x 501, 504 (10th Cir. 2003) (reversing summary judgment for contract medical personnel and the state director of corrections and other officials where the defendants were "made aware of the substantial delays in providing [prisoner's] medication through his numerous grievances" and the defendants offered no explanation or justification for the repeated delays).

The third and final prong focuses on a defendant's state of mind. The state of mind necessary to trigger a supervisor's liability varies with the type of constitutional claim. *Schneider*, 717 F.3d at 769. In the context of deliberate indifference claims, "[t]he Supreme

21

Court has established a two-pronged test for" analyzing such claims. *Rife v. Oklahoma Dep't of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017) (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 837-40 (1994)). "Under this test, a plaintiff must satisfy an objective prong and a subjective prong." *Id.*

"The objective component of deliberate indifference is met if the harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause." *Burke*, 935 F.3d at 992 (internal quotation marks omitted). This inquiry "turns on the seriousness of the need." *Clark*, 895 F.3d at 1267 (citation omitted). "A medical need is sufficiently serious if a physician directed further treatment after diagnosing the condition or the need for a doctor's attention would be obvious to a lay person." *Lance v. Morris*, 985 F.3d 787, 793 (10th Cir. 2021). A delay in medical care can constitute an Eighth Amendment violation, but only "where the plaintiff can show that the delay resulted in substantial harm." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (quotation marks omitted). "[T]he substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id.*

Here, the NMCD Defendants focus only on the subjective component of Plaintiff's deliberate indifference claim. *See* Defs.' Mot. at 6 ("This Motion deals with the subjective component only …."); Defs.' Reply at 4 ("the Motion only addressed the subjective component of the test.") The Court will therefore assume without deciding that Plaintiff's symptoms were sufficiently serious to satisfy the objective component of deliberate indifference. The Court addresses the subjective prong only.

The subjective prong component "is met if a prison official knows of and disregards an excessive risk to inmate health or safety." *Crowson*, 983 F.3d at 1178. To satisfy this prong, the plaintiff must show that the defendant was aware of a substantial risk of serious harm and chose

22

to disregard that risk. *See Lance*, 985 F.3d at 794. In conducting this analysis, "[t]he question is: were the [prisoner's medical] symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?" *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (quotation marks omitted). The Supreme Court "has insisted upon actual knowledge," i.e., "'the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*.'" *Quintana v. Santa Fe Cnty. Bd. of Commissioners*, 973 F.3d 1022, 1029 (10th Cir. 2020).

"Even so, although this portion of deliberate indifference is a subjective inquiry, a jury is allowed to infer a jail official had actual knowledge of the substantial risk to serious harm based solely on circumstantial evidence." *Est. of Burgaz by & through Zommer v. Bd. of Cnty. Commissioners for Jefferson Cnty. Colorado*, 30 F.4th 1181, 1186 (10th Cir. 2022) (citation omitted). "[I]f a risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it." *Garrett*, 254 F.3d at 950.

Viewing the allegations in the light most favorable to Plaintiff—and given that the NMCD Defendants do not dispute that Plaintiff suffered a sufficient serious medical harm—it is reasonable at this stage of the litigation to infer that the NMCD Defendants were deliberately indifferent. The FAC establishes, at a minimum, that these Defendants maintained a policy or custom of failing to medically train jail employees, delaying medical care, and keeping poor records. As noted earlier, nurses untrained in osteomyelitis were tasked with identifying Plaintiff's medical conditions, and their erroneous conclusions did not trigger provider review. As a result, Plaintiff did not see a medical doctor for nearly two months after his first report of pain and during that period he received no treatment beyond ibuprofen, even though his worsening condition was apparent. Centurion's medical director was aware that nurses are not

trained to identify to symptoms of osteomyelitis and endocarditis even though those conditions were on the rise in the prison population. And, importantly, the FAC alleges that the NMCD Defendants were aware of the substantial risk of harm posed to Plaintiff due to his visibly worsening condition. Dismissal is improper given that Plaintiff's allegations sufficiently raise issues about the NMCD Defendants' mental state.

Plaintiff also points to a report and lawsuits that contributed to the NMCD Defendants' awareness. *See Burke* 935 F.3d at 1000 (analyzing audits and reports that informed the supervisory defendant of "understaffing, inadequate training, or poor follow-up.") At least twelve lawsuits initiated by inmates against Centurion or its predecessor demonstrate, at this stage, that Centurion failed to diagnose and treat inmates exhibiting similar symptoms. The NMCD Defendants argue that these lawsuits carry little weight because Plaintiff's counsel filed these lawsuits and that many of the suits settled or were dismissed without a finding of liability. *See* Defs.' Mot. at 6 (citing *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) (holding that citizen complaints against a police officer were insufficient to hold the municipality liable under 42 U.S.C. § 1983 because the plaintiff "never demonstrated that past complaints of police misconduct had any merit.") However, *Brooks* differs procedurally because it addressed review of a jury's verdict in favor of municipality. *See* 813 F.2d at 1192. Because this is a motion for judgment on the pleadings, the standard is more deferential to Plaintiff. *See Thomas*, 765 F.3d at 1194. The deferential standard, paired with the Supreme Court's approval any "circumstantial evidence" to prove that "a prison official had the requisite knowledge of a substantial risk," *Farmer*, 511 U.S. at 842, supports Plaintiff's reliance on the lawsuits and the Committee Report to establish intent.

In summary, the Court concludes that Plaintiff has plausibly alleged an Eighth Amendment violation by the NMCD Defendants to overcome the first qualified immunity prong. *Bledsoe*, 53 F.4th at 606. The Court now turns to the second prong of that test—whether Plaintiff has plausibly alleged that the NMCD Defendants violated a clearly established right. *See id*.

### 2. The Law is Clearly Established

"A right is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Truman*, 1 F.4th at 1235. "This precedent cannot define the right at a high level of generality." *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "Rather, the precedent must be particularized to the facts." *Id*. (citing *White v. Pauly*, 508 U.S. 73, 79 (2017)) (per curiam). "A precedent is often particularized when it involves materially similar facts." *Id*. (citing *Pauly*, 508 U.S. at 79). "Nevertheless, our analysis is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Reavis estate of Coale v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020) (citation omitted). "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Thompson v. Ragland*, 23 F.4th 1252, 1255–56 (10th Cir. 2022) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

"The right to custodial medical care is clearly established." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002). "[P]rison official[s] may be held liable for deliberate indifference to a prisoner's Eighth Amendment right to protection against [inadequate medical care] while in custody if the official knows that [the] inmat[e] face[s] a substantial risk of serious

25

harm and disregards that risk by failing to take reasonable measures to abate it." *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011) (quoting *Farmer*, 511 U.S. at 834, 847) (internal quotation marks omitted). "[T]here is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1167 (10th Cir. 2022). And, more specifically, the Tenth Circuit long held that "[d]eliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment." *Ramos*, 639 F.2d at 575; *see also Paugh*, 47 F.4th at 1167 (citing at least three Tenth Circuit cases for the proposition that "it is clearly established that the actions of prison officials who prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment, constitute deliberate indifference.") (footnote omitted).

Plaintiff cites one case, *Tafoya v. Salazar*, 516 F.3d 912, 920 (10th Cir. 2008), for the proposition that "'reasonable measures' include 'serious investigation and response' when a prison official becomes aware of a risk to inmates, including medical contractors' failure to treat prisoners for emergent infections." Pl.'s Resp. at 16. *Tafoya* did not involve failure to treat emergent infections, but it did involve a supervisory liability theory against a sheriff based on his subordinates' sexual assault of a female inmate. 516 F.3d 914-915. In that case, the Tenth Circuit reversed summary judgment for the sheriff, finding that the inmate's evidence—consisting of, among other things, three prior civil suits against the sheriff for the same conduct, and the sheriff's overall lackadaisical attitude to running the prison and instituting meaningful reforms—could show that the sheriff "was aware of prison conditions that were substantially likely to result in the sexual assault of a female inmate" and "that a jury might infer that the assaults on

26

[the plaintiff] were caused by these dangerous conditions[.]" 516 F.3d at 914-16. In a later case describing *Tafoya*, the Tenth Circuit emphasized that it reversed summary judgment for the sheriff because he knew of the risk of sexual assault by guards as that exact scenario had "*already previously materialized*." *Perry*, 892 F.3d at 1126 (emphases in original).

*Tafoya* and this case obviously involve different factual contexts. But "a case directly on point" is not needed for a right to be clearly established. *McCowan v. Morales*, 945 F.3d 1276, 1285 (10th Cir. 2019). Some level of generality is permissible, and decisional law can clearly establish the law across different factual contexts. *See Paugh*, 47 F.4th at 1169 ("A plaintiff, however, need not cite a factually identical case to demonstrate the law was clearly established. Some level of generality is appropriate.") (citation omitted). For purposes of this case, the salient teaching from *Tafoya* is that a supervisor-defendant's knowledge matters. As the Court has explained above, Plaintiff has sufficiently alleged facts at this stage of the litigation demonstrating that the NMCD Defendants denied Plaintiff access to medical personnel capable of evaluating the need for treatment in violation of the Eight Amendment. Plaintiff has therefore satisfied the second qualified immunity prong to demonstrate that the NMCD Defendants violated a clearly established right.

## CONCLUSION

For the foregoing reasons, the **DENIES** the NMCD Defendants' Motion for Judgment on the Pleadings with Regard to Plaintiff's First Amended Complaint, [and] for Qualified Immunity (**Doc. 25**). The Court further **DENIES** as **MOOT** the NMCD Defendants' Motion to Dismiss and for Qualified Immunity. (**Doc. 15**).

**IT IS SO ORDERED**.

_____

HON. DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE